IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

James R. Preston,                          :

          Plaintiff,                       :

     v.                                    :     Case No. 2:16-cv-129

                                           :     JUDGE JAMES L. GRAHAM
Commissioner of Social                           Magistrate Judge Kemp
Security,                                  :

          Defendant.                       :

REPORT AND RECOMMENDATION

I.   Introduction

     Plaintiff, James R. Preston, filed this action seeking
review of a decision of the Commissioner of Social Security
denying his application for disability insurance benefits.  That
application was filed on February 8, 2012, and alleged that
Plaintiff became disabled on May 2, 2002.

      After initial administrative denials of his claim,
Plaintiff was given a hearing before an Administrative Law Judge
on September 4, 2014.  In a decision dated September 25, 2014,
the ALJ denied benefits.  That became the Commissioner's final
decision on December 18, 2015, when the Appeals Council denied
review.

     After Plaintiff filed this case, the Commissioner filed the
administrative record on April 19, 2016.  Plaintiff filed a
statement of specific errors on May 19, 2016, to which the
Commissioner responded on September 7, 2016.  Plaintiff filed a
reply brief on September 12, 2016, and the case is now ready to
decide.

II.  Plaintiff's Testimony at the Administrative Hearing

     Plaintiff, who was 45 years old as of the date of the
hearing and who has a tenth grade education, testified as

follows.  His testimony appears at pages 31-49 of the
administrative record.

Plaintiff first testified that he had not worked since 2002
and was receiving disability payments from workers' compensation.
His last job was working for Davis Trucking as a driver.  Before
that, he had been a forklift operator and worked in maintenance.
He injured his back in 1995 and suffered hip degeneration from
the cortisone shots he received for his back.  He had hip surgery
in 2005 and again in 2008.  During that time, he suffered from
both back and hip pain.  The back pain was located in the
thoracic region and radiated into his left arm.  He also had
lower back pain.

From 2002 to 2007 (Plaintiff's last insured date was in
2007) Plaintiff said that he had difficulty sitting still due to
back pain.  Standing caused the same problems.  On a good day, he
could have stood for twenty minutes, sat for the same amount of
time, and lifted two or three pounds.  He also had memory
problems, difficulty concentrating, and issues with being around
people.  His typical day during that time frame consisted of
sitting and moving around to try to get comfortable.  He did not
do any household chores but could go grocery shopping for small
items.  He could not grasp or pick up objects with his left hand.

III.  The Medical Records

The pertinent medical records are found beginning at page
410 of the record and can be summarized as follows.  Since the
records are voluminous, the Court will focus on those records
relating to the insured period in this case, which runs from 2002
to 2007, as well as other records which the parties rely on in
their memoranda.

Plaintiff has an extensive workers' compensation file.  As
he notes in his statement of errors, he initially had allowed
conditions of thoracic and lumbar strains/sprains and radiculitis

-2-

arising out of his 1995 injury.  In 2005, an additional allowed
condition of avascular necrosis was added based on the fact that
it had resulted from the treatment Plaintiff received for his
back injury.  Dr. Schoonover's report allowing the condition also
notes that Plaintiff was scheduled for total hip replacement.
(Tr. 410-12).

One of the reports which preceded the allowance of that
condition came from Dr. Berend.  Plaintiff saw him on February
22, 2005, complaining of pain in the left hip.  Dr. Berend noted
that Plaintiff could climb stairs and sit comfortably for an
hour.  He could walk two to three blocks.  X-rays showed severe
changes in the left hip with femoral head collapse noted.  Hip
replacement was recommended.  (Tr. 413-17).  Shortly thereafter,
Plaintiff followed up with Dr. Popper, who had been treating him
previously, and reported severe pain in the left hip.  As part of
his objective findings, Dr. Popper noted that Plaintiff could
stand up and sit down without much difficulty but had pain with
left knee flexion over the left hip.  Dr. Popper increased
Plaintiff's pain medication.  (Tr. 419).  In a subsequent report
to an attorney (presumably Plaintiff's workers' compensation
attorney), Dr. Popper stated that Plaintiff was "disabled from
employment" and had been since January 8, 2004.  (Tr. 420).  In
an earlier letter, written on September 14, 2004, Dr. Popper said
that Plaintiff was unable to work at any type of gainful
employment and that this would continue at least until
acupuncture therapy was completed.  (Tr. 434).  There are a great
many earlier treatment notes from Dr. Popper, many of them
indicating that Plaintiff was reporting severe and intractable
pain and the inability to do any work activity at all.  In 2003,
however, it appears that a prior treating physician, Dr. Losch,
had done a functional capacity evaluation and concluded that
Plaintiff could do medium work.  (Tr. 492).

-3-

Dr. Frank performed an independent medical evaluation of
Plaintiff on January 8, 2005.  At that time, Plaintiff's primary
issue was ongoing back pain which caused him to stop working in
2002.  He occasionally fell due to sharp pain and the pain was
exacerbated by 20 or 30 minutes of walking, repetitive bending,
lifting more than ten pounds, or prolonged sitting.  Dr. Frank
did not think that Plaintiff could return to his usual occupation
as a heavy equipment operator but he could do sedentary work.
The form he completed indicated that Plaintiff could only work
for four hours per day, however.  (Tr. 427-29).  A year before
that, a different examiner, Dr. Koppenhoefer, concluded that
Plaintiff could be a heavy equipment operator if he was only
required to operate equipment and not do repetitive bending,
stooping, or asymmetric lifting.  (Tr. 453-56).

Plaintiff continued to see Dr. Popper after hip replacement
surgery.  In February, 2006, he reported being in therapy and was
doing well with Vicodin.  He was to have his right hip replaced
later.  (Tr. 727).  The therapy for his left hip had ended by
May, 2006.  Prolonged walking was still a problem for him.  (Tr.
725).  In July, 2006, Dr. Popper stated that Plaintiff was "still
in a non work status" because he had not reached maximum medical
improvement from his hip surgery, but he should engage in a work
conditioning program to try to get him back into work status.
(Tr. 724).  By January, 2007, Plaintiff was considering having
his right hip replaced due to increasing symptoms, but that was
postponed by his orthopedic surgeon.  He was still reporting
severe pain between his shoulder blades in May, 2007.  (Tr. 718).
The right hip replacement occurred in February, 2008.

Dr. Fisher, who also did a workers' compensation evaluation,
conducted an examination of Plaintiff on January 24, 2006.  He
reported that Plaintiff's hip replacement surgery had occurred on
September 22, 2005, and that Plaintiff continued to have low back

-4-

pain as well as pain in the thoracic spinal region.  He was still undergoing physical therapy for his hip.  He was not expected to reach maximum medical improvement on that condition for several more months and still needed a right hip replacement.  No further improvement in his back pain seemed likely.  Dr. Fisher did not think Plaintiff could do any type of laboring job and, in fact, that he was unemployable due to the recent surgery, persistent back pain, and symptoms from the avascular necrosis of the right hip.  (Tr. 1052-57).

There are some early records of Plaintiff's having sought treatment for psychological impairments.  A note from the Holzer Clinic Psychology Service states that Plaintiff was seen twice in 2002 with complaints of significant dysphoria relating both to his injury and the actions of his employer concerning his injury. (Tr. 518).  Dr. Popper prescribed some medication for depression in 2003 and 2004.  However, it appears that Plaintiff did not begin active treatment with a mental health professional until 2009.  He was diagnosed with a mood disorder secondary to general medical condition and antisocial personality traits.  He said, during a psychiatric intake evaluation done in December, 2009, that he had been depressed since 2001 and that condition had worsened to the point where he could not care for himself any more.  Medication was started at that time.  (Tr. 607).  Later, Plaintiff's workers' compensation claim was expanded to allow the condition of major depressive disorder.  His psychologist, Dr. Davis, reported in 2010 that Plaintiff had suffered from depression for fifteen years and that it was gradually improving with treatment.  (Tr. 837-38).

In 2012, Dr. Richetta concluded that Plaintiff's mental condition, by itself, precluded him from meeting the basic requirements of a routine work day.  (Tr. 775-81).  Earlier, however, a different reviewer, Dr. Hawkins, said that Plaintiff

-5-

was capable of working from a mental standpoint. (Tr. 827-36). Finally, Plaintiff's counselor, Thomas Moore, expressed the opinion in August, 2012, after seeing Plaintiff for four months, that Plaintiff had extreme limitations in almost every category of mental functioning and that these limitations had existed since March 1, 1995. (Tr. 337-38).

State agency reviewers also expressed opinions about Plaintiff's mental residual functional capacity from 2002 to the present. Dr. Semmelman said that Plaintiff had a severe affective disorder and had a number of moderate mental limitations but that he could complete routine tasks in a setting not needing close sustained focus or attention or sustained fast pace and where changes were infrequent and easily explained. She also thought he would perform best in a solitary setting. (Tr. 87-95). Dr. Swain, the second reviewer, limited Plaintiff to the performance of 2-3 step tasks, noting, among other things, his history of a learning disorder, and also said that he would be unable to sustain a 40-hour work week due to intolerance to stresses and pressures. However, she limited her findings to a time period after the expiration of Plaintiff's insured status, concluding that there was insufficient evidence to assess his limitations prior to 2007. (Tr. 114).

## IV. The Vocational Testimony

Dr. Howard Caston was called to testify as a vocational expert at the administrative hearing. His testimony begins at page 49 of the administrative record.

First, Dr. Caston testified about Plaintiff's past work. He said that the maintenance job was medium and skilled; the truck driver job was medium and semi-skilled; and the forklift operator job was the same.

Dr. Caston was then asked some questions about someone with Plaintiff's background and who could work at the light exertional

-6-

level.  However, the person could not climb ladders, ropes, or
scaffolds, could stoop occasionally, could not crawl, and had to
avoid all exposure to hazards such as dangerous machinery and
unprotected heights.  In response, he said that such a person
could work as a marker, office helper, and router or dispatcher,
all of which were light and unskilled.  If the same person were
limited to sedentary jobs, he or she could be an addresser, order
clerk, or table worker.  The need to alternate between sitting
and standing would eliminate the light jobs.

Lastly, Dr. Caston was asked how many days per month a
person could miss and still do those jobs.  He said no more than
one day per month.  Being off task for 20 minutes out of every
hour was also not consistent with being able to perform those
jobs.

V.  <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision appears at pages 14-
22 of the administrative record.  The important findings in that
decision are as follows.

The Administrative Law Judge found, first, that Plaintiff
last met the insured status requirements of the Social Security
Act on December 31, 2007.  Next, she found that Plaintiff had not
engaged in substantial gainful activity since his alleged onset
date.  Going to the next step of the sequential evaluation
process, the ALJ concluded that Plaintiff had severe impairments
including lumbar strain with radiculopathy, status post total
left hip replacement, and avascular necrosis.  The ALJ also found
that these impairments did not, at any time, meet or equal the
requirements of any section of the Listing of Impairments (20
C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation
process, the ALJ found that Plaintiff had the residual functional
capacity to work at the sedentary exertional level, could not

-7-

climb ladders, ropes, or scaffolds, could stoop occasionally, could not crawl, and had to avoid all exposure to hazards such as dangerous machinery and unprotected heights.  With these restrictions, the ALJ concluded that Plaintiff could not do his past relevant work, but he could perform the jobs identified by the vocational expert, including addresser, order clerk, and table worker.  The ALJ further determined that these jobs existed in significant numbers in the national economy.  Consequently, the ALJ decided that Plaintiff was not entitled to benefits.

VI.  Plaintiff's Statement of Specific Errors

In his statement of specific errors, Plaintiff raises these issues: (1) the ALJ applied an erroneous legal standard with regard to Plaintiff's "nervous impairments"; (2) the ALJ did not evaluate every medical opinion and treating source opinion as required by 20 C.F.R. §404.1527(c); (3) the ALJ erred in the weight she assigned to the medical opinions; (4) the ALJ erred in her evaluation of Plaintiff's pain and subjective symptoms; and (5) the ALJ did not pose an accurate hypothetical question to the vocational expert.  These issues are evaluated under the following legal standard.

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th

Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

A.  Severe Mental Impairment

Plaintiff's first claim is that the ALJ erred by not finding that Plaintiff suffered from a severe mental impairment at any time prior to expiration of his insured status.  He points to several items of evidence supporting his claim, including the fact that he briefly sought treatment for mental health issues in 2002 and was prescribed psychiatric medication by Dr. Popper in 2003 and 2004, and notes that some of the later psychiatric evaluations concluded that his depression began prior to 2007 - perhaps as early as the date of his job-related injury in 1995. The Commissioner responds that the ALJ reasonably interpreted the records as failing to show a severe mental impairment prior to 2007.  The Court begins its analysis by focusing on the rationale the ALJ provided in support of her conclusion on this issue.

The administrative decision contains a one-paragraph explanation on the question of severe mental impairments, which reads as follows:

> The claimant started reporting that he was feeling depressed and anxious close to the date last insured .... However, there is no evidence of a diagnosis of depression or anxiety by a psychologist or psychiatrist before December 31, 2007.  Additionally, the claimant

-9-

did not receive mental health treatment until he went
to the Woodland Center in April of 2009, well after the
date last insured ....  As such, the undersigned finds
that depression and anxiety were not-medically
determinable impairments prior to the date last
insured.

(Tr. 16).  The ALJ made one other comment about mental
impairments, stating (at Tr. 20) that "[s]ignificant weight is
given to the State Agency psychological consultants' mental
assessments, who determined that there is insufficient (sic) to
assess the claimant's mental functioning prior to the date last
insured (Exhibit 5A).  This is consistent with his lack of
treatment or diagnosis of anxiety or depression prior to the date
last insured."  The Court finds the ALJ's analysis of this issue
to be flawed for several reasons.

First, it is simply not the case that Plaintiff did not
receive mental health treatment prior to 2009.  He specifically
sought treatment in 2002 and received treatment from Dr. Popper
for several years.  Further, it is error to equate the lack of a
diagnosis from a psychologist or psychiatrist during the insured
period with the absence of a severe mental impairment, and, in
any event, as the following discussion shows, Plaintiff was
diagnosed with such impairments even if the diagnosis came after
the expiration of his insured status.  Cf. Likes v. Callahan, 112
F.3d 189, 191 (5th Cir. 1997)(holding that "retrospective medical
diagnoses, uncorroborated by contemporaneous medical reports but
corroborated by lay evidence relating back to the claimed period
of disability, could support a finding of past impairment").

Second, the ALJ made no reference to several opinions which
are inconsistent with her analysis.  Dr. Davis, a treating
source, said in 2010 that Plaintiff had been suffering from
depression for fifteen years.  Plaintiff's counselor related
Plaintiff's depression to 1995 as well, and although he also
concluded that Plaintiff was disabled back to that date - an

-10-

assertion that seems questionable given that Plaintiff continued
to work until 2002 - the question at this stage of the inquiry is
not disability but the presence of an impairment that could
interfere with a Plaintiff's ability to work regardless of
"whether the claimant was sixty-years old or only twenty-five,
whether the claimant had a sixth grade education or a master's
degree, whether the claimant was a brain surgeon, a factory
worker, or a secretary." Salmi v. Secretary of H.H.S., 774 F.2d
685, 691-92 (6th Cir. 1985). By failing even to discuss these
opinions in connection with the severe impairment analysis, the
ALJ may well have overlooked them, and certainly provided no
rationale for not taking them into account in some fashion.

Third, the ALJ commented that the state agency psychologists
concluded that there was insufficient evidence to support the
existence of a severe mental impairment prior to Plaintiff's last
insured date. Certainly, one of them did, and that opinion is
contained in the exhibit to which the ALJ referred (Exhibit 5A),
which is the reconsideration decision on Plaintiff's disability
claim (as opposed to a claim he made for supplemental security
income, which was decided in his favor). However, as noted
above, in the initial review of the disability claim, which is
Exhibit 2A, both an affective disorder and a learning disorder
are noted to be severe impairments, and Dr. Semmelman completed a
residual functional capacity determination for the period from
May 2, 2002 forward, noted various moderate (and one marked)
limitation, and did not qualify her opinion as the later reviewer
did. Consequently, the ALJ's statement in her decision that both
state agency psychologists reached the same conclusion is not
supported by the record. The combination of these errors
concerning the severe impairment issue is not harmless and
justifies a remand.

B. Failure to Evaluate Every Medical Opinion
As his second assertion of error, Plaintiff notes that under

-11-

20 C.F.R. §404.1527(c), an ALJ is obligated to evaluate all of
the medical opinions of record.  He points out that the ALJ did
not mention either the opinion of Dr. Popper or the opinion of
Dr. Davis - both treating sources - and that this was error.  He
also argues that these sources considered conditions which were
either not considered by the sources whose opinions the ALJ did
discuss, such as avascular necrosis, or those sources did not
give adequate considerations to those conditions, as evidenced by
the ALJ's decision to give limited weight to them.  In response,
the Commissioner, relying on <u>Wilson v. Comm'r of Social Security</u>,
378 F.3d 541 (6th Cir. 2004), argues that an ALJ does not commit
reversible error by failing to mention the opinions of treating
sources if she adopts those opinions.

It is clear, however, that the ALJ adopted neither the
opinions of Dr. Popper or Dr. Davis.  As to Dr. Popper, he opined
on several occasions that Plaintiff could not work.  The
Commissioner makes a number of arguments as to why the ALJ could
reasonably have discounted that opinion, but that is simply an
example of impermissible *post hoc* reasoning, and it is
inconsistent with the notion that the ALJ actually accepted Dr.
Popper's views.  The same is the case with Dr. Davis.  The
Commissioner's assertion that substantial evidence supports the
ALJ's decision even apart from her failure to acknowledge or
discuss opinions from two treating sources is unavailing, given
that there is a clear violation of the articulation requirement
found in §404.1527(c), under which remands are routinely granted
when the ALJ fails to provide good reasons for disregarding the
opinions of treating sources.  <u>See Wilson, supra</u>.  The ALJ's
failure even to mention these opinions is also reversible error.

## C.  <u>The Credibility Determination</u>

Next, Plaintiff argues that the ALJ did not properly
evaluate his credibility.  That issue is determined in accordance
with the following principles.

-12-

A social security ALJ is not permitted to reject allegations of disabling symptoms, including pain, solely because objective medical evidence is lacking. Rather, the ALJ must consider other evidence, including the claimant's daily activities, the duration, frequency, and intensity of the symptoms, precipitating and aggravating factors, medication (including side effects), treatment or therapy, and any other pertinent factors. 20 C.F.R. §404.1529(c)(3). Although the ALJ is given wide latitude to make determinations about a claimant's credibility, the ALJ is still required to provide an explanation of the reasons why a claimant is not considered to be entirely credible, and the Court may overturn the ALJ's credibility determination if the reasons given do not have substantial support in the record. See, e.g. Felisky v. Bowen, 35 F.3d 1027 (6th Cir. 1994).

Here, the ALJ relied to a great extent on the lack of objective medical evidence to support the existence of disabling pain. (Tr. 19). She also noted that Plaintiff did not have replacement surgery on his right hip until after his insured status expired. Id. Plaintiff correctly notes, however, that his right hip was symptomatic for some time during the insured period, and the ALJ does not discuss that issue nor refer to the medical records which confirm Plaintiff's argument. Further, the ALJ's decision contains no discussion of many of the factors which, under SSR 96-7p (in effect at the time of the decision) are pertinent, such as daily activities, intensity of symptoms, and course of treatment (especially as it relates to the right hip). A remand will give the ALJ the opportunity to reassess Plaintiff's credibility on these and other issues, including issues relating to his claimed mental impairments.

D.  Vocational Testimony

Plaintiff's last issue is with the content of the hypothetical question posed to the vocational expert. Because the remand on other issues may well affect any new hypothetical

-13-

question, this issue is largely moot.  It would be helpful,
however, for the ALJ to specify the frequency of sitting,
standing, and walking in which Plaintiff can engage, and how much
of that would prevent him from being on task, because these are
factors which can affect even the performance of sedentary jobs,
something which the vocational expert in this case failed to
acknowledge, perhaps because of the imprecision in the question
which was posed.

### VII.  <u>Recommended Decision</u>

Based on the above discussion, it is recommended that the
Plaintiff's statement of errors be sustained to the extent that
this case be remanded to the Commissioner for further proceedings
pursuant to 42 U.S.C. §405(g), sentence four.

### VIII.  <u>Procedure on Objections</u>

If any party objects to this Report and Recommendation,
that party may, within fourteen (14) days of the date of this
Report, file and serve on all parties written objections to those
specific proposed findings or recommendations to which objection
is made, together with supporting authority for the objection(s).
A judge of this Court shall make a <u>de novo</u> determination of those
portions  of the report or specified proposed findings or
recommendations to which objection is made.  Upon proper
objections, a judge of this Court may accept, reject, or modify,
in whole or in part, the findings or recommendations made herein,
may receive further evidence or may recommit this matter to the
magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to
object to the Report and Recommendation will result in a
waiver of the right to have the district judge review the
Report and Recommendation <u>de novo</u>, and also operates as a
waiver of the right to appeal the decision of the District
Court adopting the Report and Recommendation.  <u>See Thomas v.
Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d

947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge